# STATE OF VERMONT

# ENVIRONMENTAL COURT

| | | |
|---|---|---|
| Secretary, Vermont Agency of | | |
| Natural Resources,  Plaintiff, | } | |
| | } | |
| v. | } | Docket No. 142-9-01 Vtec |
| | } | |
| Bruce and Deborah Hallett, | } | |
| Respondents | | |

Decision and Order

(Original order dated August 14, 2003, as corrected by September 30, 2003 order)

(corrections are shown in **bold** type on pages 13, 14 and 15, below)

On August 21, 2001, the Secretary of the Vermont Agency of Natural Resources (ANR) issued an administrative order pursuant to 10 V.S.A. § 8008 regarding Respondent, who timely requested a hearing in Environmental Court. Respondent is represented by Jack Long, Esq.; and the Secretary of the Agency of Natural Resources is represented by Catherine Gjessing, Esq.

The Court extended the time for the hearing for good cause at the request of and by agreement of the parties, to accommodate the schedules of the parties and to allow discovery. The statutes, rules and permits applicable to this matter are 4 V.S.A. Chapter 27; 10 V.S.A. § 905(b); 10 V.S.A. Chapter 201; and the Vermont Wetland Rules, in particular § § 6.3 and 8. 10 V.S.A. § 8012(c)(2).

Findings

Respondents own approximately 140 acres of land located off Winhall Hollow Road and South Road, of which approximately 100 acres is located in the town of Winhall and approximately 40 acres is located across the road in the town of Londonderry. Historically the property had been a large farm, in farm use during the century from the end of the Civil War to 1969. It was not farmed in the 1970s. When Respondents purchased the property in 1983, they began to reclaim the farm by cutting the pastures and improving the quality of the grass growing on the pastures. Most of their property is located to the north and east of and at an elevation higher than that of Cook Brook, and is not at issue in this case. Work done to create ponds on other upland portions of the property is not at issue in this case. Respondents raise beef cattle on their property.

Cook Brook runs through the lowest portion of Respondents' property, and under a bridge under Winhall Hollow Road at the intersection of Winhall Hollow Road and South Road. It runs through the field at issue in the present case. To the northeast of this field and the brook is a stone wall. Approximately a quarter of the field lies to the northeast of the brook, in a long, thin triangle between the brook and the stone wall; this decision will refer to that portion of the field

as the northeast field segment. The larger portion of the field lies between Cook Brook and South Road, forming an approximate right triangle. The short side of the triangle adjoins property of a neighbor (the Mills/Read property) to the west. The long side of the triangle runs along South Road. The hypotenuse of the triangle runs along the southwest bank of the brook, and its point extends under the bridge or through the box culvert under Winhall Hollow Road. This decision will refer to this larger portion of the field to the southwest of the brook as ' Respondent' s field;' it is the portion of Respondents' property at issue in the present case.

The Mills/Read field is slightly higher in elevation and westerly of Respondents' field, and also lies between Cook Brook and South Road. It has routinely been hayed annually since before the adoption of the Vermont Wetlands Rules in 1990. The area of both fields near Cook Brook is generally wet, and water runs off generally from the Read/Mills field onto Respondents' field on its way to Cook Brook, entering the brook at its lowest point near Winhall Hollow Road, as well as from portions of both properties northeasterly towards the brook.

An area extending along the both sides of Cook Brook on both Respondents' and the Read/Mills fields is a mapped wetland and therefore classified as a Class II wetland under the Vermont Wetland Rules. The mapped wetland extends from one-half to one-third of the way from Cook Brook towards South Road on Respondents' field, that is, the portion of the field closest to South Road does not contain a mapped wetland, although it may be within the fifty-foot buffer area of that mapped wetland.

In the context of this case it is important to explain the confusion that developed during the investigation and during the trial in reading the Vermont State Wetland Inventory Map in this area. Various versions of the map are contained in or as attachments to Exhibits 1, 8, F-1, and Y (and its enlargement Y-1). The confusion is best described with reference to Exhibits 1 and F-1 (the same map) as it is in color.

The problem arises as these maps are produced as overlays on some type of base topographical map, yet there is no key or legend to the topographical features on any of these maps, although such a key or legend may have existed on the underlying topographical map. The only features shown in the key on Exhibits 1 and F-1, the colored map, are Vermont State Wetland Inventory Wetlands, shown in a dark green, and ' endangered and threatened,' shown as a blue square. By and large, the ordinary topographical features such as contour lines, paved and unpaved roads, houses and ponds are apparent without a key or legend. However, some confusion arises from the map as to which of two types of lines represents a stream such as Cook Brook on the map. The map shows a thin light blue continuous line and a thicker purple dashed line in the vicinity of Cook Brook. At Respondents' field, the thicker purple dashed line runs to the northeast of the mapped wetland, with a thin sliver of white space between it and the mapped wetland. The thin light blue line runs into one end of the mapped wetland and out the other.

For the purposes of this decision we conclude that the thin light blue lines on the maps represent actual streams. In all instances in which they appear on the map they run down and exactly follow the fall line or valleys shown by the contour lines. The light blue color is the same color used for the single pond shown on the map, which has a thin light blue line emerging from it. On the other hand, the thicker purple dashed lines shown on the map appear near only some but not

all of the thin light blue lines. Most importantly, they do not follow the fall line or valley shown by the contour lines, but rather run near or along the shoulder of the valleys, crossing over the thin blue lines in places. Elsewhere on Exhibit 8 dashed lines represent trails or footpaths, but we have no basis from which to determine whether the thicker purple dashed lines on Exhibit F-1 represent footpaths.

This finding that the thin light blue line represents the stream has no effect on the conclusions of this order; it is only relevant to the determination of the extent of the existing mapped wetland.

Respondents' field had been used for farming purposes, that is, to raise hay and to pasture animals, from the mid-nineteenth century until Respondents' purchase of it in 1983, and continued to be used for hay through 1988 when Respondents moved to Australia. It was mowed for hay in 1988 and 1989. From 1989 through 1994, Respondents returned for annual visits and returned to reside on the property in 1995. The Vermont Wetlands Rules went into effect in early 1990. As of that date, a ditch had existed in Respondents' field adjacent to South Road, but no defined ditch had existed in the center of Respondents' field.

After Respondents returned to live at the property in 1995, they found that beavers had colonized Cook Brook in the area of their field, so that the field had become a very wet meadow, particularly wet in the spring, and was too wet to hay or even to mow. Due to their inability to mow, brushy vegetation, in particular willow, alder and dogwood, was growing up in the field, providing more habitat for the beaver population to increase. Initially, a neighbor attempted to trap the beavers out in the winter, but this was unsuccessful to control the beaver population. In the winter of 1998-1999, South Road was at risk from flooding and icing due to the beaver dams, to the extent that the Winhall police requested and obtained Respondents' permission to remove the beavers. They removed seventeen beavers but by the middle of the following summer the beaver population had recovered. By the summer of 1999, at least four beaver dams were located on Cook Brook at Respondents' property, and the wet areas had spread to create pools within the field.

In addition, in the spring of 1999 the neighbors had dug a ditch on the Read/Mills property, running south to north near the boundary of the Read/Mills field with Respondents' field, apparently intended to drain the Read/Mills field northerly through the ditch to Cook Brook. However, one of the beaver dams was located in Cook Brook directly downstream from the intersection of the Read/Mills ditch with Cook Brook. Due to the relative topography of the brook, the Read/Mills field and Respondents' field, the Read/Mills ditch instead drains water from the Read/Mills field onto Respondents' field, close to the center of the westerly property line of Respondents' field, approximately midway between Cook Brook and South Road. During times of high water, and especially when water backs up, the Read/Mills ditch actually conducts water from Cook Brook onto Respondents' field.

Because the Read/Mills property had been used for farming activities on an annual basis since before the effective date of the Vermont Wetlands Rules, the Read/Mills property falls within the Section § 3.1 exemption in those rules, so that even the draining of the Read/Mills field was allowed under[1] those rules.

After unsuccessful attempts from 1995 through 1998 to eliminate the beavers by trapping or shooting, Respondents undertook work in late summer of 1999 with heavy equipment to remove the beaver dams and to remove sufficient alders, willows and other beaver habitat to discourage the beavers from returning, and to till, seed and mulch the soil to restore the field as a farm pasture or hay field.

As of the summer of 1999, the wetland in Respondents' field was a palustrine scrub-shrub wetland with an emergent wetland component. It was significant for the function of floodwater storage, for the function of protecting water quality, for the function of providing fisheries habitat, and for the function of providing habitat for wildlife and migratory birds. It was not significant for or not claimed to have provided the functions of hydrophytic vegetation habitat, threatened or endangered species habitat[2], education and research, recreational value, open space and aesthetics

The work began in the northeast field segment in early September of 1999. Due to a neighbor's complaint of excavation equipment in the brook and alteration of the channel of the brook, an Environmental Enforcement Officer from the Agency of Natural Resources investigated on September 7, 1999. Because the area had become wetter due to the beaver dams, it is possible that the equipment was located in areas of wet soil or standing water, without the equipment's actually being in the brook or the channel of the brook.

At that time work was only being done in the northeast field segment, and, although work was done very close to the northeastern bank of the brook, there was no work in the brook itself, no alteration of the channel, and no discharge of silt to the brook. Due to his misreading of the dashed purple line on the map as Cook Brook, the Environmental Enforcement Officer believed that the northeastern field segment was not part of the mapped Class II wetland, and therefore that no work was being done in a mapped wetland. Accordingly, on September 7, 1999, the Environmental Enforcement Officer merely directed Respondents' contractor not to allow soil to get into the brook, and did not further discuss at that time whether wetlands issues would be implicated if similar work were done in the field on the southwest side of the brook. Even if the Environmental Enforcement Officer had not been mistaken as to the true facts of the location of the mapped wetland on the northeast side of the brook, his statements did not estop the Agency from later claiming that the work done on the other side of Cook Brook was done in a mapped wetland, because he made no representations as to the location of the mapped wetland on the other side of the brook.

The Environmental Enforcement Officer returned on September 14, 1999, when the contractor was doing site work on an upland pond unrelated to the work at issue in the present case. If he discussed with the contractor the fact that later work done 'upstream' along Cook Brook might implicate wetlands or stream alteration issues, it was discussed in the general context of what kinds of complaints warranted investigation and not with specific reference to whether later work planned for Respondents' field on the southwest side of Cook Brook would implicate wetlands issues or wetlands regulations.

In November of 1999, Respondents undertook work with heavy equipment to remove sufficient alders, willows and other beaver habitat from Respondents' field on the southwest side of the

brook to discourage the beavers from returning, and to till, seed and mulch the soil to restore the field as a farm pasture or hay field. Respondents worked carefully to protect the stream and stream banks, and no claims are made in this proceeding that Respondents violated the stream alteration statute or regulations.

In connection with that work, Respondents' dug a shallow ditch adjacent to South Road, running into Cook Brook near Winhall Hollow Road, and dug a shallow ditch parallel to South Road down the center of the field, approximately at the edge of the mapped wetland as shown on State's Exhibit 1, also running into Cook Brook upstream of Winhall Hollow Road. This center ditch, although shallow, was effective to conduct any additional water draining onto Respondents' field from the Read/Mills property back to Cook Brook near the Winhall Hollow Road bridge.

Respondents reseeded the field in the spring of 2000. No erosion or discharge to the stream is claimed to have been caused by the clearing, tilling, seeding and mulching, or by the digging of either the roadside ditch or the center ditch. Respondents preserved an eight to ten-foot-wide buffer of undisturbed shrubs and shrub rootstocks along the banks of the stream, which had begun to regrow in the 2000 season and which had substantially regrown as of the date of trial. Due to this litigation, after the 2002 season Respondents preserved a thirty-foot-wide buffer of undisturbed shrub rootstocks along the banks of the stream, which have also begun to grow up. Even a ten-to-fifteen foot stream buffer is sufficient to preserve the wetland's functions for fisheries habitat, as it successfully shades the stream and a wider buffer provides no additional shade.

The work done by Respondents did not adversely affect the function of the wetland in Respondents' field for floodwater storage or for the function of providing fisheries habitat. The work done by Respondents did somewhat reduce the function of the wetland in Respondents' field for the function of protecting water quality, and for the function of providing habitat for wildlife and migratory birds. The function of the wetland in protecting water quality was reduced due to the increased ' smoothness' in the grass surface as compared to the rough surface of the mixed shrubs and wetland vegetation on the field, making the field less effective at trapping eroded particles than it was before the work was done. This reduction in the effectiveness of the water quality function was due to the clearing of the field and not to the creating of the center ditch. The function of the wetland in providing habitat for wildlife and migratory birds was reduced in that the grass surface provides less cover and less nesting habitat than the mixed shrubs and wetland vegetation, although it still provides some, and the vegetated stream buffer still provides both habitat and a corridor for wildlife to continue to traverse the site. This reduction in the wildlife and migratory bird habitat function was due to the clearing of the field and not to the creating of the center ditch.

As of the fall of 2002, the site was characterized again by emergent hydrophytic vegetation. A rare wetlands plant known as muskflower is now thriving in the middle ditch, as it requires both wet soils and sunlight. If shrubs were allowed to grow up alongside the middle ditch to shade it, similar to the shade along the stream, it would shade out the muskflower. For that reason, plugging or filling the middle ditch and allowing the shrubby vegetation to grow up along the middle ditch is not reasonably likely to achieve the intended result of enhancing and protecting the wetlands functions of Respondents' field.

The Agency seeks to require a fifty-foot-wide stream buffer on both sides of the stream, similar to that which might be recommended for logging jobs to protect streams and prevent stream alteration and the discharge of eroded soils into the stream. Respondents wish a stream buffer of no more than ten feet, to minimize the likelihood that the beavers will return. Under an interim order in the early summer of 2003, Respondents are maintaining a 30-foot buffer from the edge of the stream, but their preference is to maintain an approximately 10-foot buffer on either side of the stream. A ten or fifteen foot buffer on either side of the stream is sufficient to maintain the stream channel and stream banks in good condition and to shade the stream to protect the fisheries resource and to provide a corridor for stream-related wildlife.

Respondents hayed the field in the years 2001 and 2002, obtaining two cuttings per year, yielding approximately 25 large round bales each year or the equivalent of 500 standard bales of hay annually. Standard bales of hay are valued at from $1.75 to $2.75 per bale, depending on the quality of the hay. Using $2.25 per bale as an average figure, they therefore obtained $1,125 per year in the value of the hay over the two years, or a total of $2,250.

The Agency's actual costs of enforcement constitute $2,000 for an independent expert's evaluation of the wetland and of Respondents' expert's remediation recommendations, including the time during the hearing, $250 for the District Wildlife Biologist, $1,300 for the Wetlands Coordinator and $350 for the Environmental Enforcement Officer.

Conclusions as to Violation (10 V.S.A. § 8012(c)(1)):

The statute requires this Court to determine whether a violation has occurred, 10 V.S.A. § 8012(b)(1), independently of reviewing and determining anew a penalty amount. 10 V.S.A. § 8012(b)(4). In the present case, this determination requires an understanding of the farming exemption found in Section 3 of the Vermont Wetland Rules as compared with the treatment of farming as an allowed use under Section 6 of the Vermont Wetland Rules.

Under § 3.1 of the Vermont Wetland Rules, land used as of 1990 to grow food or crops in connection with farming activities, including areas in ordinary rotation, are exempt from the definition of wetlands, even if those areas contain mapped wetlands or otherwise would qualify as wetlands by their characteristics or functions. The farming exemption is a type of grandfathering provision and removes the land from being classified as or regulated as a wetland. The land loses this exemption " whenever the area is no longer used to grow food or crops or in ordinary rotation." § 3.1(c).

Thus if, in 1990 after the Vermont Wetland Rules went into effect, Respondents had continued to hay the field, or to pasture animals there, on an annual basis or on a schedule that was shown to be " in ordinary rotation," Respondents' field would have maintained its farming exemption. They did not do so, and it lost the farming exemption.

Once it lost the Section 3 farming exemption, Respondents' field contained a Class II mapped wetland and its fifty-foot buffer zone. It appears from Exhibits 1 and F-1 that the wetland and buffer zone did not extend all the way across the field to South Road, although the scale of that map is too small to measure the buffer zone exactly, and neither party surveyed the boundary of

the mapped wetland and its buffer zone in the field. It appears from Exhibits 1 and F-1 to have fallen somewhere between the center ditch and the ditch adjacent to South Road.

Under § 6.2 of the Vermont Wetland Rules, certain listed activities can occur in a Class II wetland and its buffer zone without any prior review by the Agency, that is, without obtaining a Conditional Use Determination (CUD). One of the allowed uses (§ 6.2(*l*)) is the maintenance, reconstruction or routine repair of structures in existence as of February of 1990, such as South Road and its roadside ditch. Activities under § 6.2(*l*) may include draining, dredging, filling or grading, unlike activities under most of the other subsections of § 6.2 (see its introductory paragraph). Accordingly, whether the shallow roadside ditch was within or outside of the mapped Class II wetland and its buffer zone, under § 6.2(*l*) of the Vermont Wetland Rules it was allowed to be dug out, reconstructed and maintained, and that work did not constitute a violation.

Another of the allowed uses under § 6.2 is " the growing of food or crops in connection with farming activities," in compliance with the Department of Agriculture' s Acceptable Agricultural Practices and if threatened or endangered species are protected and deer wintering yards are not cleared of existing vegetation. § 6.2(f). The negative implication of the deeryards provision is, of course, that existing vegetation otherwise may be cleared in a wetland for the growing of food or agricultural crops. However, this allowed use remains subject to the language of the introductory paragraph of § 6.2 that the allowed uses may be undertaken without review, provided that the flow of water into or out of the wetland is not altered and that no draining, dredging, filling or grading occurs.

The Administrative Order does not cite Respondents for removal of the beaver dams or for any work within the stream itself. Therefore we do not address whether the removal of the beaver dams required a Conditional Use Determination under the Wetlands Rules. Compare § 6.2(d) (allowing the removal of beaver dams in connection with silvicultural activities), with § 6.2(f) (silent as to the removal of beaver dams in connection with farming activities), but see also 10 V.S.A. Appendix, Fish and Wildlife Regulations, Chapter 1, § 43(e). The stream bed and bank was not affected and a vegetated buffer of shrubs is regrowing along the stream bank. One of the major issues that divides the parties is what the appropriate width of this streambank buffer should be. This will have to be addressed on remand, as ordered below, and should include any consideration of beaver management, including the involvement of the Town and any permit of the Commissioner of Fish and Wildlife under § 43(e) of the Fish and Wildlife Regulations; as well as any ' wildlife management activities conducted in accordance with a written plan approved by the Secretary of the Agency,' which is another exemption found in § 6.2(n) of the Wetlands Rules.

Thus, if Respondents had cut the vegetation in Respondents' field, and had dug out the roadside ditch sufficient to restore the field to farming use, without digging the center ditch, and then had been able to grow grass in the field, they would have remained within the farming allowed use of § 6.2(f). Under those circumstances, none of the cutting of vegetation would have been a violation, even though it dramatically changed the appearance of the field and reduced the wetland' s functions for wildlife habitat and water quality protection.

We recognize the possibility that the center ditch was only made necessary by the fact that the Mills/Read ditch was casting additional water onto the center of the westerly boundary of Respondents' field, and that the increased amount of water would not have been present at that location without the Mills/Read ditch. However, any common law remedy Respondents may have with regard to the Mills/Read ditch is beyond the jurisdiction of this Court and in any event would not justify a violation of the Vermont Wetland Rules.

The digging of the center ditch in Respondents' field constituted the draining of the field. Because of this draining, Respondents' use of that field for farming activities was taken out of the ' allowed use' category of § 6.2(f), and required a conditional use determination under § 6.3. Therefore, by digging the center ditch in Respondents' field without a Conditional Use Determination for the work, Respondent violated Vermont Wetland Rule § 6.3.

Determination of Order and Penalty (10 V.S.A. § 8012(c)(3)):

The Administrative Order against Respondent contains remedial provisions. 10 V.S.A. § 8012(b)(2). It requires Respondents to submit a detailed restoration plan including a wetland delineation of the wetland and buffer zone as it existed prior to the work, and to propose the planting or revegetation of the wetland and buffer zone; to receive approval of the plan, to implement the plan including any erosion control and wetland restoration directives, and thereafter to refrain from " excavating, filling, draining or engaging in any activity other than allowed uses in Class One and Two wetlands or the fifty (50) foot buffer zone" prior to obtaining a Conditional Use Determination and other listed permits.

The planting or revegetation of the wetland and buffer zone as it existed prior to the work, including the possibility of filling in the center ditch, is not reasonably likely to achieve the intended result, because both parties now agree that the center ditch should not be filled in or shaded, to protect the muskflower, and because Respondents would have the right under § 6.2(f) to cut any restored vegetation for farming purposes, without a Conditional Use Determination. Accordingly, those sections of the order issued under 10 V.S.A. § 8008(b)(5) must be vacated and remanded.

In addition to addressing the remedial provisions, the Court must review and determine anew an appropriate penalty amount for the violations by applying the eight criteria set forth in 10 V.S.A. § 8010(b). 10 V.S.A. § 8012(b)(4). In the Administrative Order, the Secretary imposed a penalty of $10,500 for the violation. In this proceeding, the Secretary has requested a penalty of $27,500 for the same violation, now including some enforcement costs of preparing for the hearing in this matter, and the economic benefit of the hay harvested from the property.

First we must note that for a civil penalty to withstand constitutional scrutiny, it must be basically remedial in effect, rather than punitive. The methodology inherent in the statute and applied by this Court is to remove the economic benefit gained from the violation, in order to carry out the statutory purpose of preventing the unfair economic advantage obtained by persons who operate in violation of environmental laws, 10 V.S.A. § 8001(2) and § 8010(b)(5), and then to apply the remaining statutory factors to determine what additional penalty is needed, or whether mitigating factors should reduce any element of the penalty. That is, the entire economic

benefit first must be removed to carry out a primary purpose of the Uniform Environmental Enforcement Act: to make it less expensive to comply with the law than to violate it.

We take each of the penalty factors in turn, bearing in mind that the only violation was the digging of the central ditch, and that neither the State's wetland expert nor Respondent's wetland expert now recommends the filling in of that ditch. The economic benefit to Respondent for digging the central ditch was the avoided cost of obtaining the volume of hay that was cut from the field. It amounted to approximately **500** standard bales of hay per year for 2001 and 2002, or a total of **1,000** bales at a cost of **$2,250**, using an average price per bale of $2.25.

To assess the actual environmental harm, we must separate the harm from the central ditch from the removal of habitat caused by the cutting of brush and clearing of the field to replant it with hay, as that clearing was allowed under § 6.2(f), absent the creation of the central ditch. § 8010(b)(1). Most of the dispute regarding the need for a large buffer zone stems from the Agency's assumption that the entire field should be returned to the condition it was in prior to cutting. The harm described by the Agency's witnesses is the reduction in the wetland's wildlife habitat and water quality functions due to the cutting of the vegetation and replacing it by hay. However, if that cutting was allowed under the regulations, and only the central ditch was a violation, then we must assess any environmental harm resulting from the ditch and not from the cutting. If the central ditch should be eliminated, that is, should be filled in, then the harm should be assessed from its existence for the period of time it was in place, and Respondents should not receive the benefit of any drainage provided by the central ditch over and above that now provided by the cleared-out roadside ditch and by Cook Brook itself in its current condition without the beavers. However, the difficulty in making this assessment is that <u>both</u> the Agency's and Respondents' experts testified that the central ditch should not be filled in. Accordingly, we must conclude that no environmental harm resulted from the creation of the central ditch.

Respondents argue that the Court should consider as a mitigating circumstance the Environmental Enforcement Officer's apparent approval or acceptance of the work done in the northeastern field segment, although that portion of the field also was within the Class II wetland or its buffer. However, as no ditch was dug in the northeastern field segment, that apparent approval did not affect the fact that it was the digging of the ditch that was the violation, not the clearing of the field.

Respondents also argue that the Court should consider as a mitigating circumstance evidence of some apparent prejudice, at least on the part of the neighbors if not also on the part of one of the Agency investigators, against people perceived as coming into Vermont from elsewhere. As the calculation of penalty is <u>de novo</u> with the Court, personal attitudes held or expressed by complainants or even by Agency personnel will not be considered in the penalty calculation. No unnecessary delay was imported into these proceedings by the Agency. §§ 8010(b)(2) and (3).

Respondents have no prior record of non-compliance. § 8010(b)(4). The Secretary's costs of enforcement in the present case total $3,900 for the independent expert and the three Agency personnel who investigated and analyzed the violation. § 8010(b)(7). The length of the violations was relatively short; Respondents stopped work as soon as told to do so by the Agency personnel. The cut vegetation is revegetating itself in any area not continued to be cut. §

8010(b)(8). No additional penalty beyond the removal of economic benefit and costs of enforcement, as well as the cost of compliance with any ultimate remedial order, is necessary to achieve deterrence in this case. § 8010(b)(6).

Accordingly, taking all the penalty factors into account, the Court will impose a penalty for the violation of a total of **$6,150**, calculated as **$2,250** in removal of economic benefit, plus the Secretary's enforcement costs of $3,900.

Based on the findings, conclusions, and reasoning of this decision, it is hereby ORDERED that:

Paragraph A of the August 21, 2001 Administrative Order is vacated. On or before October 1, 2003, Respondent shall pay a penalty of **$6,150** for the violations to the State of Vermont, to be deposited in the general fund pursuant to 10 V.S.A. § 8010(e).

Paragraphs B, C and D of the August 21, 2001 Administrative Order are vacated and remanded, as the violation consisting of the digging of the center ditch was found to exist, but the procedure contained in paragraphs B, C and D, including the extent and nature of the components of any restoration plan, and the standards by which the Agency determines whether to approve any restoration plan proposed by Respondents, is not reasonably likely to achieve the intended result. The question of whether or not the plan proposed by Respondents should be revised, modified, or approved by the Agency, is open to be addressed by the Agency in the course of its work after remand.

Paragraph E of the August 21, 2001 Administrative Order is upheld.

Paragraph F of the August 21, 2001 Administrative Order is modified as follows, and as modified is affirmed:

Respondents shall refrain from excavating, filling, draining or engaging in any activity other than allowed uses in Class One and Two wetlands or the fifty (50) foot buffer zone of Class One and Two wetlands prior to obtaining a Conditional Use Determination to do so. Be advised that other state and federal permits, including but not limited to a state Water Quality Certification and a federal Army Corps of Engineers permit, may also be required for any such activity.

Any party wishing a separate V.R.C.P. 58 judgment order may propose one for the Court's signature so that it is received by the Court on or before August 25, 2003; otherwise it will be deemed to have been provided by the above paragraphs modifying the Administrative Order, as required by 10 V.S.A. § 8012(b).

Rights of Appeal (10 V.S.A. § 8012(c)(4) and (5)):

WARNING: this decision will become final if no appeal is requested within 10 days of receipt of this decision. Respondent and the Secretary of the Agency of Natural Resources have a right to appeal this decision. The procedures for requesting an appeal are found in the Vermont Rules of Appellate Procedure (V.R.A.P.) subject to the exceptions in Vermont Rules of Civil Procedure (V.R.C.P.) 76(a)(3) and (d)(5). Within 10 days of receipt of this Order, any party seeking to file

an appeal must file the notice of appeal with the Clerk of this Court, together with the applicable filing fee. Questions may be addressed to the Clerk of the Vermont Supreme Court, 111 State Street, Montpelier, VT 05609-0801, (802) 828-3276. An appeal to the Supreme Court operates as a stay of payment of a penalty, but does not stay any other aspect of an order issued by this Court. 10 V.S.A. § 8013(d). A party may petition the Supreme Court for a stay under the provisions of V.R.C.P. 62 and V.R.A.P. 8.

Done at Barre, Vermont, this 30th day of September, 2003.

_____
Merideth Wright
Environmental Judge

## Footnotes

[1]. This Court has no jurisdiction to determine if Respondents have any common law remedies with respect to any water cast upon their property by the Mills/Read ditch.

[2]. The only evidence on this function was a reported sighting in the late 1970s of the sedge wren, not reported since that date.